By the Beview PaNel :
By House Kesolution 1177 of the 90th Congress, 2d Session, the United States House of Bepre-sentatives, on June 16, 1968, referred H.B. 4815, a bill for the relief of Faith M. Lewis Kochendorfer and others, to the Chief Commissioner of the United States Court of Claims *1048 pursuant to 28 U.S.C. § 1492 (1964 ed.) and 28 U.S.C. § 2509 (1965-69, Supp. V). The Chief Commissioner referred the matter to Trial Commissioner Lloyd Fletcher for proceedings in accordance with the rules. After pretrial proceedings, a trial at which the claimants and the United States adduced such evidence as they desired in support of their respective positions, and the submission of requested findings of fact and briefs, Trial Commissioner Fletcher issued an opinion and accompanying findings of fact on July 31, 1970. He concluded that the airplane collision in which Mr. Gene A. Lewis lost his life was caused by the negligence of one of two Air National Guard pilots engaged in a training flight in the vicinity of the Cheyenne Municipal Airport and that claimants therefore had an equitable claim against the United States. He supplemented his conclusion as to liability by ascertaining the amount of money damages equitably due each of the several claimants.
The United States duly excepted to the trial commissioner’s conclusions as to both liability and damages. The parties thereupon again filed briefs and presented oral argument before the panel on November 24, 1970.
Subject to slight modifications dealing with cosmetic matters and with the admissibility and probative standing of a oab accident investigation report, as well as with the standard of liability in congressional reference matters, the review panel agrees with the results announced in Trial Commissioner Fletcher’s opinion and supporting findings of fact. It, therefore, adopts the bulk of his work as the basis for its report which follows:
OpiNiON op the Trial Commissioner
Fletcher, Commissioner:
These proceedings relate to H.R. 4815 of the 90th Congress, 1st Session, entitled “A bill for the relief of Faith M. Lewis Kochendorfer, and others” which was by H. Res. 1177 of the same Congress referred to the Chief Commissioner of the United States Court of Claims pursuant to 28 U.S.C. § 1492 (1964 ed.) and 28 U.S.C. § 2509 (1965-69 Supp. Y).
*1049 In order to avoid unnecessary duplication, only the essential facts are summarized here. Complete details will be found in the separately stated findings of fact which accompany this opinion.
In the mid-afternoon of December 15,1959, an F-86L jet fighter aircraft, flown by Air National Guardsman Captain William Meckem, collided with a Beechcraft Bonanza flown by Mr. Gene A. Lewis at approximately 2,850 feet above the ground. The collision occurred about 4.5 miles south of the Cheyenne Municipal Airport, outside that airport’s traffic pattern but within its control zone. The weather conditions at the time were excellent with only high thin cirrus clouds and a visibility of 90 miles. Lewis, the pilot and only occupant of the Bonanza, was killed. Captain Meckem was able to eject and parachute to safety although he sustained minor injuries. Both aircraft were destroyed.
Early in the morning of December 15,1959, Lewis departed from his home, St. Cloud, Minnesota, on a flight to Denver, Colorado. He landed at Dickinson, North Dakota, for the combined purpose of conducting some business there and fueling his Bonanza to capacity. He left Dickinson at 12:35 p.m. an!d shortly after takeoff, airfiled a ver flight plan[1] with the eaa communications station. According to this flight plan, Lewis proposed to fly to Kapid City, South Dakota, direct to Denver at 8,500 feet mean sea level. About 1:43 p.m., Lewis contacted Bapid City radio stating he was 4,500 feet over the city ver to Denver. He requested and was furnished latest weather information.
The Lewis Bonanza was equipped with very high frequency omnirange (vor). This navigational instrument is fully described in footnote 1 of finding 7, infra. Here, it is sufficient to note that a pilot may use the vor to fly with great accuracy from one omnirange station on the ground to another. From all of the available evidence, it has been concluded that Lewis was navigating his airplane by this well- *1050 accepted technique which would have resulted in his being on a probable heading for Denver of about 166 degrees magnetic at the time of the accident. See finding 9, infra.
Meanwhile, at 2:20 p.m., Captain Meckem and Lieutenant Howard T. Anderson took off in formation from the Cheyenne Municipal Airport in two F-86L jet fighter aircraft. The purpose of the flight was a technical evaluation of Lieutenant Anderson by Captain Meckem in his capacity as a training supervisor for the Air National Guard Squadron. After conducting a number of maneuvers at high altitude, Lieutenant Anderson called the Cheyenne tower and requested a practice jet penetration and simulated ins low approach. The tower cleared the flight as requested, advising it to maintain ver at all times and to report to the tower at designated points which was done.
As the flight crossed the airport over Runway 26, Lieutenant Anderson asked for a “simulated flame-out”. The tower approved the request but Captain Meckem informed Lieutenant Anderson that he had insufficient fuel for the maneuver prior to landing. Lieutenant Anderson, therefore, transmitted to him, “Let’s enter on initial and join on the turn.” In essence this transmission meant that the flight would proceed around the airport and land; it also meant for Captain Meckem to join in close formation. After the low approach, the jet flight made an approximate 30-degree right turn just past the end of Runway 26 in conformity with a noise-abatement procedure to avoid flying over Ft. Warren Hospital. The jet flight then continued outside the traffic pattern limits in a left climbing turn and passed well to the right of the Ft. Warren Hospital, located two to three miles beyond the end of the runway. Lieutenant Anderson continued the left turn to 110 degrees, interrupting it once on a heading of about 180 ’degrees to clear the turn. Captain Meckem closed in the turn to close formation. He took position on Lieutenant Anderson’s right wing with his aircraft slightly below the level of Lieutenant Anderson’s with four to five feet wingtip separation. Lieutenant Anderson planned to reach 9,000 feet, 270 knots, and a 110-degree heading simultaneously. For all *1051 practical purposes this was done, and both F-86 pilots estimated that it occurred about 30 seconds before the collision.
At this point Lieutenant Anderson was the formation leader and Captain Meckem was the wingman. Accordingly, because formation flying requires the wingman’s undivided attention to the leader, the responsibility to see and avoid other aircraft was entirely that of the formation leader. This is in accordance with Civil Air Regulations and military directives. Lieutenant Anderson stated that he clearly understood his responsibility and believed he had' maintained a careful lookout for other air traffic. In his testimony he recalled stopping the turn at about 180 degrees to clear the area, particularly in the direction he intended to continue. He testified that during the last 30 seconds, he scanned the left quadrant, then straight ahead, and then the right quadrant. Lieutenant Anderson stated that at the same time he scanned, he also checked Captain Meckem’s position. He stated that when he returned his vision forward, he saw an aircraft immediately in front of him and made a violent pullup to avoid it. He said it all occurred so quickly he had no time to warn Captain Meckem or even to identify the plane. Captain Meckem’s attention was concentrated on the formation formup and thereafter on holding close position and that so far as the collision itself was concerned, he recalled a flash on his windscreen an instant before impact. He did not recognize the Beechcraft. In fact, he assumed he had collided with a T-33 aircraft which had been overheard in the traffic pattern.
The collision just described occurred at 9,000 feet M.S.L. or 2,850 feet above the ground. There is no dispute that, at the time of the collision, the two F-86L jets were in close formation on a heading of 110 degrees magnetic, in straight and level flight and traveling at a computed true air speed of 312 knots. There is also no dispute that the Bonanza was traveling at a true air speed of approximately 139 knots, but there is considerable dispute as to its heading and flight attitude at the time of collision.
Both National Guard pilots thought the Bonanza heading was approximately 180 degrees, and in subsequent litigation *1052 described below, the United States District Court so found. The cab investigators, from an analysis of the structural shearing through the Bonanza fuselage, concluded that at the time of contact, the Bonanza was on a heading of 154 degrees. As stated above, 'based upon the conclusion that Lewis would be utilizing his vor equipment to fly from Cheyenne omnirange to Denver omnirange, I have concluded that his probable course was approximately 166 degrees magnetic.[2]
Defendant, on the other hand, contends that the Bonanza heading was more nearly 230 degrees magnetic which would place the F-86L formation some 45 degrees to Lewis’ right.
This belated contention, made for the first time in defendant’s requested findings of fact and memorandum of law filed in this proceeding, depends entirely upon the testimony in the United States District Court litigation by a ground witness, Dale E. Nickerson, who claims to have seen the Bonanza before and during the collision.[3]
A full analysis of Mr. Nickerson’s testimony will be found in finding 14 below. He stated that while driving his truck south of Cheyenne on the afternoon of the accident, he noticed a “small plane” on his left proceeding in a southwesterly direction. Whether this “small plane” was the Lewis Bonanza is not clear. The aircraft which he first saw may well have been other traffic known to be in the vicinity of the airport. It has also been concluded, without in any way questioning Nickerson’s veracity, that he was a poor observer because he firmly testified that, at the time of collision, he saw only the Bonanza and Captain Meckem’s jet. Yet the evidence is clear that almost immediately before the collision, Lieutenant Anderson made a “violent pullup” to avoid the Bonanza. Surely this spectacular maneuver would have caught the eye of Mr. Nickerson unless, as is concluded, he actually saw the accident just after it occurred.
*1053 Nickerson also thought he saw the Bonanza make a sharp left bank and pullup mto the jet. It is clear, however, that no such thing occurred because, as pointed out by the cab investigators, the wings of neither aircraft made contact and, hence, must have been in straight and level flight. The F-86L’s nose structure sheared off the fuselage of the Bonanza just behind its right rear cabin window with no damage occurring to the wings of either the Bonanza or the striking F-86L.
The importance of defendant’s factual contention as to the Bonanza heading is this. If the Bonanza was headed on approximately 230 degrees, then the jet flight was 45 degrees to Lewis’ right, and pursuant to the requirements of the cab Air Traffic Buies, it would have been his duty to give way to the jet flight. See 14 C.F.B. 60.14 (b) (1956 ed). On the other hand, if the Bonanza heading was anywhere between 154 degrees (as found by the cab) and 180 degrees (as found by the District Court), a so-called “overtaking” situation existed and under the applicable Air Traffic Buies, it was the duty of the overtaking aircraft to keep clear of the overtaken aircraft. See 14 C.F.B. 60.14(d).
The credible evidence in this record establishes that the Bonanza was on a heading not less than 154 degrees nor more than 180 degrees so that, the F-86L jets being on a 110-degree heading, an overtaking situation existed with the overtaking aircraft traveling at over twice the speed of the overtaken Bonanza. The record also shows that Lewis and Meckem were both in straight and level flight at the time of collision, for otherwise there would have been vertical deformation to the aircraft structures and their wings would have made contact, neither of which occurred. The testimony of Nicker-son to the contrary has been disregarded as being an optical illusion by an inexperienced observer.
Accordingly, I join the cab in its conclusion from all the facts that the probable cause of this accident was that, during an overtaking situation, the jet formation leader (Anderson) failed in his duty to see the Bonanza in time to lead his wing- *1054 man (Meckem) off collision course.[4] One of the most significant facts in this record is that, only seconds before the collision, Lieutenant Anderson looked to his rear for the purpose of checking Captain Meckem’s position. Had he not done so but instead had concentrated his entire visual attention to the 180-degree quadrant ahead of his aircraft, it is reasonable to surmise that, despite his high rate of speed, he would have seen the Bonanza in time to warn Meckem, and this unfortunate accident would have been avoided. The fair conclusion then is that the collision was attributable solely to the negligence of Lieutenant Anderson, the formation leader.[5]
Under 28 U.S.C. § 2509(c), the trial commissioner shall “inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.”
There can be no doubt that plaintiffs here have no legal claim against the United States, and it is not believed that counsel for plaintiffs even suggests the contrary. As to all plaintiffs except Baston[6] (part owner of the Bonanza Aircraft) , the issue of legal liability has already been decided adversely to them. Pattno v. United States, 311 F. 2d 604 (10th Cir., 1962), cert. denied 373 U.S. 911 (1963). There, the administrator of the estate of Lewis brought suit in the United States District Court for the District of Wyoming under the Federal Tort Claims Act. 28 U.S.C. §§ 1346(b), 2401 (b), 2671-2680. The District Court denied recovery on the ground that, at the time of the accident, neither Meckem nor Anderson were employees of the United States but were officers of the Wyoming Air National Guard, not in active *1055 Federal service.[7] The Tenth Circuit Court of Appeals affirmed, stating at p. 607:
An interpretation of the record before us to permit the conclusion that either flying instructor Meckem or trainee Anderson was an employee of the United States would so weaken the pertinent constitutional provision as to once more corrupt the distinctions, clearly set forth therein, between the powers and duties of the two governments. The decision that neither Meckem nor Anderson, at the time of the accident, was acting as an employee of the United States disposes of the case and does away with any need to discuss the question of negligence. [Emphasis supplied.]
That this decision of the Tenth Circuit was quite correct is evidenced by the fact that a few years later the United States Supreme Court, in a similar case, held the same way. See, Maryland for the Use of Levin v. United States, 381 U.S. 41 (1965), vacated on other grounds, 382 U.S. 159 (1965).
Hence, the question of legal liability of the United States is res judicata and has been settled adversely to plaintiffs.
This, of course, is not the end of the matter. Even though there is no legal liability, in a congressional reference case, Congress desires to be advised whether an “equitable claim” exists. 28 U.S.C. § 2509(c). While it is true that in this sense, the word “equitable” is used in the nonjuridical sense of broad moral responsibility — what the Government ought to do as a matter of good conscience — it is equally true that even under this approach the sovereign’s liability must rest on some unjustified act or omission that caused the claimants’ damage. Absent fault of the conventional common law negligence variety, an award would amount to a pure gratuity. B. Amusement Co. v. United States, 148 Ct. Cl. 337, 342, 180 F. Supp. 386, 390 (1960).
*1056 To ascertain the proper standards for fixing liability in a given case, it is helpful to take account of the general principles governing the particular area of the law bearing on the claim. In an accident situation such as that at hand those principles are logically to be found in the Federal Tort Claims Act, which makes the United States liable for “* * * personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant * * 28 U.S.C. § 1346(b) (1964 ed.). Since this statute embodies the general principles of tort law applicable between private parties, it can suitably provide the general framework for appraising these plaintiffs’ “equitable” claim. Estates of E. L. Armiger, et al. v. United States, 168 Ct. Cl. 319, 384, 339 F. 2d 625, 628 (1964).
First, it should be observed that there are good reasons in the present case for Congress filling the agency void that the Supreme Court found to exist in Levin, supra, between the Federal and National Guard military establishments.
As was pointed out by the Tenth Circuit in Pattno v. United States, 311 F. 2d 604, 607 (1962), cert. denied, 373 U.S. 911 (1963), the F-86L airplanes involved were defendant’s property, and the salaries of their pilots were paid by defendant.
These factors show that the interest of the United States is served by the existence of trained reserve forces. Even though the technical responsibility for training those forces is left to the States, the defendant is deeply concerned therewith. Furthermore, in September 1960 Congress amended Title 32 of the Code to provide for limited administrative adjustment and settlement of claims arising out of torts committed by National Guard personnel.[8] 32 U.S.C. § 715. As the court noted in Patino, supra, this legislation constituted congressional “recognition of moral obligation” for *1057 torts of National Guardsmen even though they are not in the service of the United States for purposes of suit under the Federal Tort Claims Act. 311F. 2d 607.
Against a background of the above considerations the fact that the evidence fairly suggests that the fatal crash was caused by the negligence of the formation leader, Anderson, is amply sufficient to establish an equitable claim by plaintiffs within the meaning of that concept as established and developed by the relevant precedents in this court. Accordingly, payment to the plaintiffs of the sums specified in findings 24 (d) and (e) accompanying this opinion would not be mere gratuities but constitute the discharge of a bona fide moral obligation.
FINDINGS on Fact
1. These claims have been referred to the Chief Commissioner of the Court of Claims by House Eesolution 1177,90th Congress, 2d Session, which reads as follows:
Resolved, That PI.R. 4815, entitled “A bill for the relief of Faith M. Lewis Kochendorfer and others”, together with all accompanying papers is hereby referred to the chief commissioner of the Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code, for further proceedings in accordance with applicable law.
2. H.R. 4815, 90th Congress, 1st Session, in pertinent part, provides as follows:
Be it enacted by the Senate cmd House of Representatives of the United States of AmeHea in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, sums to the f ollowing named individuals in the amount shown: Faith M. Lewis Kochendorfer, widow of Gene A. Lewis, $75,000; Dick A. Lewis, son of Gene A. Lewis, $25,000; Nancy J. Lewis Keithley, daughter of Gene A. Lewis, $25,000; Knute K. Lewis, son of Gene A. Lewis, $25,000; Robert P. Hendrickson as guardian of the estates of Peggy A. Lewis, Kim C. Lewis, and Cindy L. Lewis Kochendorfer, minor children of Gene A. Lewis, $75,000; and Frederick L. Bastón, partner of Gene A. Lewis, $5,000. The payment of such sums shall be in full satisfaction of all *1058 claims of the said individuals against the UnitedStates for compensation for the death of Gene A. Lewis, and property losses as the result of an aircraft accident near the Cheyenne, Wyoming, airport on December 15, 1959. In that accident, a military aircraft operated by a member of the Wyoming Air National Guard while participating in National Guard training collided with an aircraft operated by Gene A. Lewis.
House Deport No. 1462 which accompanied H. Res. 1177 states that the bill referred to the Chief Commissioner arose out of an aircraft accident near Cheyenne, Wyoming, on December 15, 1959, in which Gene A. Lewis lost his life. The Report continues:
* * * The claims are those of his widow and his six children and a business partner. The accident occurred when two low-flying National Guard fighter aircraft approached a private airplane flown by Mr. Lewis and one of the aircraft struck the private airplane.
The bill H.R. 4815 was the subject of a subcommittee hearing on September 20, 1967. At that hearing the history of the claimants’ attempts to secure redress was discussed in the testimony. As is noted in the Air Force and Justice Department reports, they attempted to assert a claim against the United States in a U.S. district court based on negligence as provided in the tort claims procedures of title 28 of the United States Code. The decision in the Federal courts was that neither of the National Guard pilots was acting as an agent of the Federal Government at the time of the accident and so there was no jurisdiction in the Federal Court to consider the case because agency is a prerequisite for such an action.
However, there is another element to the matter which has led the committee to conclude that the entire matter Should be the subject of a congressional reference case as is provided in House Resolution 1177. On September 13,1960, subsequent to the accident referred to above Public Law 86-740 was enacted into law. This law which originated as a bill before this committee amended section 715 of title 32 of the United States Code to provide for the administrative settlement by the Federal Government of claims arising from certain training activity of the National Guard. While this law did not apply to accidents which arose prior to its enactment, it appears *1059 that these claims are of the type which could have been considered under that law. It is, therefore, clear that these claimants have been barred from asserting their claims in the Federal courts on jurisdictional grounds and also barred from asserting their claims with the Air Force under the provisions of section 715 of title 32 because the accident occurred prior to the amendments which would have permitted their consideration. It has therefore been concluded that the most equitable adjustment of the matter would be to extend to these claimants the opportunity to present their claims to the chief commissioner of the Court of Claims in accordance with the quasi-judicial procedures available under the provisions providing for congressional reference cases. The Congress will then be able to consider the matter after a full hearing on the basis of the findings of fact and the recommendations of the chief commissioner of the Court of Claims. This procedure will also provide for a full consideration of all of the issues raised in the reports of the Department of the Air Force and the Department of Justice. It is recommended that House Resolution 1177 be favorably considered.
3. On August 16, 1960, the Civil Aeronautics Board adopted its Aircraft Accident Report (File No. 2-1771), wherein are set forth detailed findings of fact, including conclusions as to probable cause, with respect to the midair collision involved herein. By 49 U.S.C. § 1441(e), no part of any such report “shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report * * Accordingly, in prior litigation of this matter under the Federal Tort Claims Act (described in more 'detail below), the cab Report was not admitted into evidence, or otherwise used in that lawsuit, although by stipulation of counsel, statements of the cab investigators were entered hi the record before the United States District Court. In this congressional reference case, which is arguably not a “suit or action for damages” in the conventional sense, 49 U.S.C. § 1441 (e) would not seem to bar use of the Report. See, generally Israel v. United States, 247 F. 2d 426 (CA 2, 1957); Berguido v. Eastern Air Lines, Inc., 317 F. 2d 628 (C.A. 3, 1963); SimpsoN, Use of Aircraft Accident Investigation Information in Actions for Damages, *1060 17 J. AIR. L. & COM. 283 (1950). Even if it be assumed that in fashioning Section 1441 (e) Congress intended to extend the confidentiality that it conferred on cab accident investigation reports to congressional reference-type proceedings generally, it is clear that in this particular instance it intended to lift that cloak because it included the Report among the evidentiary materials that it transmitted to the Chief Commissioner for his consideration in arriving at his ultimate recommendation to the Congress. Moreover, the conclusions reached by the cab Report as to the cause of the collision are corroborated by the testimony of the two military pilots at the District Court trial, in which they acknowledged the “overtaking” posture of the military aircraft at the time of the collision — a vital element in the fixing of responsibility that would itself justify the major conclusion reached by the cab Report.

Flight Personnel Involved

4. Gene A. Lewis, age 37 at the time of his death in the accident described below, resided in St. Cloud, Minnesota. He was married and the father of six children. His business activities centered around a fairly extensive sign and advertising enterprise, and, in addition, he owned and supervised a number of gasoline service stations located in Minnesota, North Dakota, and Wisconsin.
On June 29, 1959, the Federal Aviation Agency (eaa) issued to Lewis a private pilot’s certificate with single-engine rating. At that time he had acquired 19 hours of dual flight instruction of which six hours were on cross-country, and he had 82 hours of solo flight time, of which 62 hours were cross-country. At the time of the accident, Lewis had accumulated approximately 325 hours of flying time. He held a class III medical examination certificate, issued[1] April 22, 1959.
5. Captain William E. Meckem, age 31, resided in Dubois, Wyoming. At the time of the accident he was employed by the 187th Fighter Interceptor Squadron of the Wyoming Air National Guard as an air training supervisor on a full-time basis. He was rated pilot on flying status and possessed *1061 a 3-2 (white) instrument card issued by the Air Force. Captain Meckem also held a commercial pilot certificate with single-engine land and instrument ratings. He held a currently valid military physical examination certificate. He had flown a total of 2,450 hours. Of this total 1,250 were in military aircraft, of which 160 were in F-86L aircraft.
6. First Lieutenant Howard T. Anderson, age 80, resided at 1663 Chester, Aurora, Colorado, and was employed as a professional pilot. Lieutenant Anderson was also a member of the 187th Fighter Interceptor Squadron as a part-time reserve officer. He was a squadron pilot. He was rated pilot on flying status and held a 3-2 (white) instrument card issued by the Air Force. He also held a commercial pilot certificate with single-engine, multi-engine, and instrument ratings. Lieutenant Anderson held currently valid eaa and Air Force medical certificates. He had accumulated a total of 1,400 hours, of which 800 were in civilian aircraft and 600 were in military aircraft. He had flown 500 jet hours, of which 250 were in F-86L aircraft.

Aircraft Involved

7. Beechcraft C-35, N 1839D (commonly referred to as a “Bonanza”) was manufactured by the Beech Aircraft Company in March 1952. It was purchased by Lewis and his co-owner, Frederick L. Bastón, on May 19, 1959. All records indicated that the aircraft had been maintained in an airworthy condition. For purposes of communication and navigation, Bonanza N 18391) was equipped with vhf (very high frequency) radio and omnirange, the latter being commonly referred to as vok equipment.[1]
*1062 8. Tbe two jet fighter aircraft involved were known by the designation F-86L and were manufactured by North American Aviation, Inc. They were possessed and maintained by the 187th Fighter Interceptor Squadron of the Wyoming Air National Guard based on the Cheyenne, Wyoming, Municipal Airport. The jet aircraft, also, were properly inspected and maintained in an airworthy condition.

Events Leading Df to the Accident

9. On December 15,1959, Lewis planned and prepared for a solo flight in Bonanza N1839D from St. Cloud, Minnesota, to Denver, Colorado, with an enroute combined business and fueling stop at Dickinson, North Dakota. He departed St. Cloud at 7 o’clock in the morning and flew to Dickinson without filing a flight plan and under visual flight rules (ver). There Lewis conducted his business, and the Bonanza was fueled to capacity by adding 22.3 gallons of gasoline. He left Dickinson at 12:35 p.m. and shortly after take-off airfiled a veR flight plan to Denver with tihe Dickinson faa communications station. According to the flight plan thus filed, he proposed to fly to Rapid City, South Dakota, direct to Denver at 8,500 feet m.s.l. (mean sea level), and he estimated three hours and fifteen minutes enroute with five hours of fuel aboard. About 1:43 p.m., Lewis contacted Rapid City radio, stating he was 4,500 feet over the city ver to Denver. He requested and was furnished the latest winds aloft and weather appropriate to his flight.
At this time, Lewis had a choice of two routes to Cheyenne on his way to Denver. He could fly a direct course, a distance of 217 miles which would have taken him over mountainous terrain with no enroute navigation facilities or, utilizing his vor equipment, he could fly from Rapid City to the Scotts-bluff, Nebraska, omnirange, and from there to Cheyenne omnirange, a distance of 229 miles. Since the latter route would take him over more favorable terrain with an increase of only 12 miles’ distance, and he would have the benefit of omnirange equipment for navigational purposes, one of the cab investigators concluded that Lewis probably took the *1063 Scottsbluff route, a conclusion which the investigator verified by a computation of the Bonanza’s average ground speed from Sapid City to Cheyenne.
This conclusion of the cab investigator is accepted as reasonable. It is standard and normal practice for a pilot flying cross-country in an aircraft equipped with vor to make use of that equipment by flying his aircraft from one omnirange station on the ground to another. This procedure reduces the hazard of getting lost to a minimum and is, therefore, widely used by pilots even though the technique of flying from omni-range station to omnirange station is rarely a direct line to the ultimate destination. See, Pilots Radio Handbook, Federal Aviation Agency (1962), p. 96.
Based upon the conclusion that Lewis was making use of this navigational technique, it is possible to reconstruct his course headings to the point of collision, using for this purpose the Cheyenne Sectional Aeronautical Chart of June 1, 1959. Upon arriving over Scottsbluff omnirange, Lewis would have turned his aircraft to a heading for Cheyenne omnirange of 222 degrees magnetic. Upon arriving over Cheyenne omnirange (which is located a few miles northeast of the Cheyenne Airport), Lewis would have turned his aircraft to a heading for Denver omnirange of 166 degrees magnetic. It is concluded that Lewis was flying on approximately that heading when the collision occurred a few miles south of the Cheyenne Airport.[2]
10. Meanwhile, at 2:20 on the afternoon of December 15, 1959, Captain Meckem and Lieutenant Anderson took off from the Cheyenne Municipal Airport as a flight of two in F-86L jet fighter aircraft. The purpose of the flight was a technical evaluation of Lieutenant Anderson by Captain Meckem in his capacity as a training supervisor for the Air National Guard Squadron. Lieutenant Anderson acted as flight leader and Captain Meckem was wingman. They conducted a number of maneuvers at high altitude, during which Lieutenant Anderson flew his aircraft principally by refer *1064 ence to instruments while Captain Meckem flew as safety observer positioning his aircraft slightly below and to the right of Lieutenant Anderson. During these maneuvers it was Captain Meckem’s responsibility, as safety pilot for the flight, to look out for other aircraft and avoid collision.
Shortly before the collision, Lieutenant Anderson called Cheyenne tower and requested a practice jet penetration and simulated ins (instrument landing system) low approach. The tower cleared the flight as requested, advising it to maintain VER at all times and to report to the tower at designated points which was done.
As the flight crossed the airport above Eunway 26, Lieutenant Anderson asked for a “simulated flameout pattern.”[3] The tower approved the request; however, Captain Meckem, about this time, informed Lieutenant Anderson he had insufficient fuel for the maneuver prior to landing. Lieutenant Anderson, therefore, transmitted to him, “Let’s enter on initial and join on the turn.” This transmission in jet fighter parlance meant the simulated flameout would not be made, the flight would proceed to the initial point,[4] enter the initial approach,[5] and land. It also meant for Captain Meckem to join in close formation.
After the low approach, the jet flight made an approximate 30-degree right turn just past the end of Eunway 26 in conformity with a noise-abatement procedure to avoid flying over Ft. Warren Hospital. The jet flight then continued outside the traffic pattern limits in a left climbing turn and passed well to the right of the Ft. Warren Hospital, located two to three miles beyond the end of the runway. Lieutenant Anderson continued the left turn to 110 degrees, interrupting it once on a heading of about 180 degrees to clear the turn. Captain Meckem closed in the turn to close formation. He *1065 took position on Lieutenant Anderson’s right wing with his aircraft slightly below the level of Lieutenant Anderson’s with four to five feet wingtip separation. Lieutenant Anderson planned to reach 9,000 feet, 270 knots, and a 110-degree heading simultaneously. For all practical purposes this was done, and both F-86 pilots estimated that it occurred about 30 seconds before the collision.
At this point Lieutenant Anderson was the formation leader and Captain Meckem was the wingman. Accordingly, because formation flying requires the wingman’s undivided attention to the leader, the responsibility to see and avoid other aircraft was entirely that of the formation leader. This is in accordance with Civil Air Regulations and military directives. Lieutenant Anderson stated that he clearly understood his responsibility and believed he had maintained a careful lookout for other air traffic. In his testimony he recalled stopping the turn at about 180 degrees to clear the area, particularly in the direction he intended to continue. He testified that during the last 30 seconds he scanned the left quadrant, then straight ahead, and then the right quadrant. Lieutenant Anderson stated that at the same time he scanned he also checked Captain Meckem’s position. He stated that when he returned his vision forward, he saw an aircraft immediately in front of him and made a violent pullup to avoid it. He said it all occurred so quickly he had no time to warn Captain Meckem or even to identify the plane. Captain Meckem’s attention was concentrated on the formation formup and thereafter on holding close position and that so far as the collision itself was concerned, he recalled a flash on his windscreen an instant before impact. He did not recognize the Beechcraft. In fact, he assumed he had collided with a T-33 aircraft which had been overheard in the traffic pattern.

The Collision and Analysis of Probable Pause

11. The collision occurred at 9,000 feet, m.s.l., or 2,850 feet above the ground. It took place about 4.5 miles south-southwest of the southern boundary of the Cheyenne Municipal *1066 Airport, outside the airport traffic pattern but within the airport control zone. The computed true airspeed of the F-86L formation was 312 knots and that of the Bonanza was 139 knots. Lewis, the pilot of the Bonanza, and its only occupant, received fatal injuries. Captain Meckem, the pilot of the colliding F-86L ejected safely by parachute and sustained only minor injuries. Both aircraft were destroyed. The weather conditions at the time of the collision were virtually clear with only high thin cirrus clouds and visibility was approximately 90 miles.
12. In their investigation of an aircraft accident, the gab experts generally, if not always, make a careful study of the inflight structural damage suffered by the colliding aircraft. They did so in this case and from the evidence of structural shearing through the Bonanza fuselage they determined that the inflight contact sequence began with the Bonanza on a heading of 154 degrees magnetic and the F-86L, flown by Captain Meckem, on a heading of 110 degrees magnetic. Initial inflight contact occurred when the F-86L’s nose structure contacted the fuselage of the Bonanza just 'behind the right rear cabin window. The sequence progressed as the nose structure above the wing of the F-86L penetrated and cut through the Bonanza fuselage at an angle of 110 degrees to the fuselage centerline measuring clockwise from the nose. This contact sheared off the Bonanza fuselage aft of the right rear cabin window while the right wing of the F-86L passed below the plane of the wings of the Bonanza. Because the colliding F-86L was in straight and level flight during the collision sequence, and because the wings of neither aircraft made contact, it is apparent that the Bonanza was also in straight and level flight. That both aircraft were in straight and level flight is further substantiated by the lack of vertical deformation to the structures involved. The investigators therefore concluded that no evasive action occurred and, accordingly, that Lewis did not see the F-86L’s during the collision closure.
Based upon these findings, a vector diagram was prepared for the purpose of plotting the probable flight paths of the aircraft during the 60-second period of closure prior to the *1067 collision. From the study it was possible to determine the relative position of each aircraft to the other at any given period. Similarly, it was possible to assess the opportunities afforded each pilot to have sighted the other’s aircraft in order to avoid the collision.
The study shows that at the beginning of the 60-second period the colliding aircraft were separated 3.48 statute miles. At this time the Bonanza was located 67 degrees to the left of the nose of the jet formation leader’s aircraft. It would have been slightly above the leader and visible to him through the canopy glass, presenting a quartering rear profile. During the first 30 seconds, while the F-86L’s were turning, the angular position of the Bonanza gradually shifted to a position about 26 degrees to the left of the nose of the leader’s aircraft and to approximately eyelevel. During the final 30 seconds, with formation straight and level, the position of the Bonanza would remain unchanged.
The study also shows that at the beginning of the 60-second period, the F-86L formation was positioned 129 degrees to the right rear of the nose of the Bonanza, or approximately 40 degrees to the rear of the 90-degree position. The jets would have been below the level of the Bonanza. During the first 30 seconds, the position of the jet formation would gradually shift forward until it was positioned level at a sighting angle of 110 degrees to the right rear of the nose of the Bonanza. During the final 30 seconds this position would remain unchanged.
13.. From all the facts found by its investigators, the Board determined that the probable cause of this accident was that, during an overtaking situation, the jet formation leader (Anderson) failed to see the Bonanza in time to lead his wingman (Meckem) off collision course. The Board’s conclusions were as follows:[6]
*1068 From the available evidence and analytical study of this accident it is the conclusion of the Board that an overtaking situation occurred in which the F-86L formation overtook the Beechcraft from its right rear. The Board concludes that during the 60-second period of closure the Beechcraft was positioned well within the forward visual quadrant of the jet formation leader and that it presented, an adequate profile for visual detection within the distance which separated the aircraft. The Board therefore concludes that there was an adequate opportunity for the jet formation leader to have seen the Beechcraft in time to have led his wingman off collision course, in accordance with the responsibility of an overtaking pilot.
At all times during the 60-second period before collision the jet formation was positioned well to the right rear of the Beechcraft. This position was as much as 129 degrees and was never less than 110 degrees. It is fundamental that a pilot’s primary responsibility is to direct his attention to the most critical area, which is the 180-degree quadrant ahead of his aircraft. While this is not intended to mean that a pilot should not search all areas available to him, it does mean that his greatest effort should be. in the direction of flight with reliance that an. overtaking pilot will similarly fulfill the same responsibility. Accordingly, the Board does not believe that the opportunities afforded Mr. Lewis were sufficiently adequate to have expected him to have seen the jets.
14. Consideration will now be given to the testimony of Dale E. Nickerson, the only known eyewitness of this accident from the ground. He was not called as a witness by either party in the present congressional reference proceeding but he did testify before the United States District Court in the Federal Tort Claims litigation referred to below. According to his testimony there, shortly before this accident occurred, Nickerson was driving a ready-mix concrete truck up “Denver Hill” just south of Cheyenne when he noticed a “small plane” on his left proceeding in a southwesterly direction. It is not clear from his testimony how long he continued to watch the “small plane.”[7] He stated that shortly *1069 after be bad made a rigbt-band turn from Highway 85-87, be saw two airplanes collide in tbe air, one of which be recognized as a jet airplane. The other he apparently assumed to be the “small plane” which he had seen a few minutes earlier. It looked to him as though the “Beechcraft made a sharp left bank” a split second before contact and he thought that the Beechcraft “just pulled right up into the jet and it nosed over.” Mr. Nickerson never saw Lieutenant Anderson’s jet airplane until later when Lieutenant Anderson circled over the airplane debris on the ground. Based solely upon Nicker-son’s testimony, the defendant has constructed a hypothetical course heading for the Bonanza of approximately 280 degrees magnetic. By construction of this course, defendant concludes that the F-86L formation was actually 45 degrees to Lewis’ right and that, therefore, under applicable civil air regulations, it was the duty of Lewis to give way to the aircraft on his right, citing 14 C.F.R. 60.14(b).
Based upon all the information available in this record, and without in any way questioning Mr. Nickerson’s veracity, I cannot accept the accuracy of his observations.[8] They are contrary to all the other evidence, and it seems probable that Mr. Nickerson actually saw this accident immediately after it occurred. For example, he saw only the Bonanza and Captain Meckem’s jet, and yet the evidence is clear that no more than a second or two before the collision, Lieutenant Anderson made a “violent pullup” to avoid the Bonanza. It seems clear that anyone observing the aircraft involved prior to the actual collision could not have failed to see this spectacular maneuver by Lieutenant Anderson. However, Mr. Nickerson was firm in his statement that he saw only the two colliding aircraft.
Also, contrary to Nickerson’s observation, it was quite clear from the structural damage done to the aircraft that the Bonanza did not “pull up” into the jet. Rather, as found by the cab investigators, the nose of the F-86L sheared through the Bonanza fuselage and separated it just aft of the right rear cabin window.
*1070 As to Nickerson’s sighting of a “small plane”, several minutes before the collision at a spot from which defendant computes a 230 degree heading for the Bonanza, it has been concluded that Nickerson’s testimony in this respect is too vague to justify such a finding. Both Lieutenant Anderson and Captain Meckem thought the Bonanza heading was approximately 180 degrees; and the United States District Court so found. By their analysis of the structural damage, the cab investigators arrived at a heading for the Bonanza of 154 degrees. As stated in finding 9, supra, I deem it to be most probable that Lewis was flying voR from Cheyenne omnirange to Denver omnirange on a course of 166 degrees magnetic. In any event, there appears to be no basis for finding Lewis to have been flying on a course of 230 degrees. The “small plane” which Nickerson saw to his left while driving up Denver Hill may well have been the-T-33 which Captain Meckem first assumed he had struck, or even some other airplane in the airport control zone.

Previous Litigation

15. In January 1960, the administrator of the estate of Gene A. Lewis brought suit against the United States under the Federal Tort Claims-Act (28 U.S.C. §§ 1346(b), 2401(b), 2671-2680) in the United States District Court for the District of Wyoming. The case was tried without a jury before the Honorable Ewing T. Kerr on June 20-21, 1961. Judge Kerr denied recovery on the ground that the accident was not caused by the negligence of an employee of the United States while acting within the scope of his employment. It was his conclusion that Captain Meckem and Lieutenant Anderson, as members of the Wyoming Air National Guard, were employees of Wyoming and not employees of the United States at the time of the accident.
16. Although this holding properly disposed of the case in favor of the defendant, Judge Kerr went on to make a gratuitous and unnecessary finding as follows:
14. Both Lieutenant Anderson and Captain Meckem operated their aircraft in a responsible' and careful manner in all respects.
*1071 This dicta, obviously prepared by then counsel for defendant, does not even reflect Judge Kerr’s instructions given to counsel at the conclusion of the trial. According to the certified Transcript of Kecord, Judge Kerr advised counsel, in pertinent part, as follows:
I am going to make a specific holding in this case. I am going to hold, first, that Meckem was not on active duty. I think the record so shows. I am going to hold, second, that he was not a caretaker within the meaning of the Act — I forget the number of it. And, thirdly, I am going to hold that the plaintiff has failed to sustain by a preponderance or greater weight of the evidence that Meckem was negligent. I don't think it is necessary to go beyond that.
I will sustain the motion for summary judgment and, while the rules do not require findings of fact and conclusions of law on a summary judgment, I am going in this case to ask that findings of fact and conclusions of law be prepared in accordance with my -findings. Each party to pay its own cost.
That is the way I see this case, gentlemen. I can’t see any negligence at all on the part of Meckem. [Emphasis supplied.]
Thus, the District Court’s finding 14 was not only dicta; it was not prepared in accordance with Judge Kerr’s instructions.
No one has ever suggested that wingman Meckem was negligent. The negligence was- that of formation leader Anderson who, in an overtaking situation, failed in his responsibility to observe the Bonanza in time to lead Meckem off collision course.
17. The aforesaid decision of the District Court was appealed to the United States Court of Appeals for the Tenth Circuit which affirmed the decision on November 19, 1962. Patino v. United States, 311 F. 2d 604 (10th Cir. 1962), cert. denied, 373 U.S. 911 (1963). The Circuit Court held at 311 F. 2d 607:
An interpretation of the record before us to permit the conclusion that either flying instructor Meckem or trainee Anderson was an employee of the United States would so weaken the pertinent constitutional provision *1072 as to once more corrupt the distinctions, clearly set forth therein, between the powers and duties of the two governments. The decision that neither Meckem nor Anderson, at the time of the accident, was acting as an employee of the United States disposes of the case amd does away with any need to discuss the question of negligence. [Emphasis supplied.]
18. Subsequent to this accident, Congress enacted Pub. L. 86-740, effective September 13, 1960. This law amended 32 U.S.C. § 715 to provide for the administrative settlement by the Army or Air Force of claims arising out of certain training activities of the National Guard.[9] Under subsection (b) (4), such a claim may be allowed only if—
(4) the damage to, or loss of, property, or the personal injury or death, was not caused wholly or partly by a negligent or wrongful act of the claimant, his agent, or his employee; * * *
19. Colonel Donald A. Williams, Chief of the Tort Branch of the Office of the Judge Advocate General of the Air Force, testified in this proceeding that if this collision had occurred at a time when the aforesaid National Guard Claims Act was in effect, and had resulted in an administrative claim under that Act, he would have denied the claim because, in his opinion, the collision was caused wholly or partly by the negligence of Lewis in the following respects:
(a) He had deviated from his flight plan some 22 miles without advising the faa of the deviation.
(b) He was flying over a large airport at a relatively low altitude of 3,000 feet above the ground, was in radio contact with the control tower at the airport, but failed to inform the tower of his position.
(c) He failed to maintain an alert watch for other aircraft. He also thought that some weight, although very little, should be given to the fact that Lewis had compiled a long record of automobile traffic violations, in particular, convictions for speeding. To Colonel Williams, these traffic vio *1073 lations were some indication that Mr. Lewis might fly his airplane in the same way he drove an automobile. Under all these circumstances, Colonel Williams stated it was the position of the Air Force that Congress should reject the present claims because the collision was caused wholly or partly by negligence on the part of Lewis and, therefore, would not be compensable under the theory of the National Guard Claims Act.
20. While Colonel Williams was completely sincere in his opinion testimony, it is felt that his conclusion was defective in that he failed to take into account a number of factors. He arrived at his assertion that Lewis had deviated 22 miles from his flight plan simply by drawing a straight line from Eapid City to Denver. However, it has already been explained above that a pilot normally does not fly such a course when his aircraft is equipped with tor. The normal and safe practice in such a situation is to fly from one omnirange station to another. See finding 9, supra.
As to Colonel Williams’ point that Lewis was flying at an altitude of about 3,000 feet above the airport and had failed to advise the control tower of his position at the time he requested weather information from the tower, this fails to take into account that there is no law or regulation requiring a position report in such a situation. While many pilots contacting a control tower do make routine position reports, under we conditions the Federal Aviation Agency does not require such reporting. Also, Lewis was at an altitude above the normal trafile pattern and, in short, had a right to be where he was and was not operating his aircraft in violation of any law or regulation.
As to Colonel Williams’ belief that Lewis failed to maintain an alert watch for other aircraft, there is no showing that Lewis failed to maintain such a watch in the 180-degree quadrant ahead of his aircraft which was his primary responsibility. The National Guard jet struck him from the rear.
The Lewis record of automobile traffic violations was given no weight by Judge Kerr, and even Colonel Williams thought that record was entitled to “very little” weight. A habit of *1074 unsafe speeding in driving an automobile would appear to have little relevance to the technique of safely flying an airplane where the maintenance of flying speed is an important safety consideration.
21. The Civil Aeronautics Board Air Traffic Bules in effect at the time of the collision provided that “when two or more aircraft of the same category are converging at approximately the same altitude, each aircraft shall give way to the other which is on its right” (14 C.F.E. 60.14(b)), and “An aircraft that is being overtaken has the right-of-way, and the overtaking aircraft, whether climbing, descending, or in horizontal flight, shall keep out of the way of the other aircraft by altering its course to the right, and no subsequent change in the relative positions of the two aircraft shall absolve the overtaking aircraft from this obligation until it is entirely past and clear.” (14 C.F.E. 60.14(d) (1956 ed.))
ultimate FINDINGS AND CONCLUSIONS
22. The above-described midair collision was caused by the negligence of Formation Leader Anderson, who, in an overtaking situation, failed to observe the Bonanza in time to warn Wingman Meckem so that the latter could avoid collision with the Bonanza. Lewis was not guilty of any negligence contributing to this accident.
23. Although plaintiffs do not have a legal claim against the United States, they do have an “equitable claim” and, accordingly, there are equitably due them from the United States the 'amounts set forth in findings 24 (d) and (e).
24. (a) According to Air Force Eegulation No. 112-2, para. 18, the law of the jurisdiction where an accident occurred should ordinarily be used as a guide in determining awards for personal injury or death in the consideration of Air National Guard claims.
(b) Under Wyoming law, there is no limit on the amount of recovery which may be obtained in wrongful death actions. Under the Wyoming Code of Civil Procedure, section 1-1066, the court or jury in a wrongful death action may consider as elements of damages the amount the survivors *1075 failed or will fail to receive out of decedent’s earnings, and any other pecuniary loss directly and proximately sustained by the survivors, including a reasonable sum for the loss of comfort, care, advice, and society of decedent.
(c) The amounts of money set forth in H.E. 4815 were computed on an actuarial basis, giving the decedent a life expectancy of 34 years and assuming an annual contribution by decedent towards the support and maintenance of his wife and children of $12,000. An interest rate of 4 percent was used in that computation.
(d) It is concluded and recommended that a more realistic interest rate is 6 percent and, while on this record the assumption of an average $12,000 annual contribution by decedent to the support of his family seems reasonable, his work-life expectancy of 25 years should be used in the computation instead of a life expectancy of 34 years. The present value of an annuity of $12,000 for 25 years at 6 percent interest is $153,400.27. Under the intestacy laws of Minnesota, Faith M. Lewis Kochendorfer, as widow of Gene A. Lewis, would be entitled to one-third of the aforesaid amount, or $51,133.42. Under the aforesaid Minnesota law, the remaining two-thirds ($102,266.85) should be divided equally among the decedent’s six children, or $17,044.47 per child.
(e) It has been stipulated that the fair market value of Beechcraft Bonanza N 1839D just prior to the accident was $9,000 and that plaintiff, Frederick L. Bastón, owned a one-half interest in said aircraft. Therefore, there is equitably due plaintiff, Frederick L. Bastón, the sum of $4,500.

 In aviation parlance vfk Is an abbreviation for “Visual Flight Rules” and ■when operating an airplane under vim conditions, it Is the pilot’s responsibility to avoid collision by visual detection of other aircraft. It Is sometimes referred to as the “See-and-Be-Seen Rule.”

 Tiie Cheyenne Sectional Aeronautical Chart of June 1, 1959 which Lewis presumably was using for navigation shows the heading from Cheyenne omni-range to Denver omnirange to be 166 degrees.

 He was not called as a witness by either party in the present congressional reference proceeding but he did testify before the United States District Court in the Federal Tort Claims litigation referred to below.

 The Board’s conclusions in this respect are quoted in finding 13, infra.

 The defendant has made no showing that Lewis was guilty of contributory negligence. Despite defendant’s assertions to the contrary, Lewis was not off course but was navigating by accepted von techniques. When he requested weather information from the Cheyenne tower, he was flying at an altitude where no position report was required by the c.a.r. under vfr conditions. So far as the record shows, he was keeping an alert watch for other airplanes in the 180-degree quadrant ahead of him in proper reliance that pilots to his rear would do the same.

 As to Bastón, of course, the statute of limitations has long since run, and for that reason alone he has no legal claim against the united States.

 The District Court judge went on to make an entirely gratuitous finding that both Anderson and Meckem had “operated their aircraft in a responsible and careful manner in all respects.” The findings were prepared by then counsel for defendant on oral instructions from the District Court judge at the close of that trial. Not only was the finding in question unnecessary dicta, it does not properly reflect the judge’s instructions. He said only that he saw no negligence on Meckem’s part and made no reference to Anderson. The Tenth Circuit Court of Appeals quite properly ignored the finding. See finding 16, infra.

 This amendment was enacted after the accident here involved and was not made retroactive. Maryland for the Use of Levin v. United States, supra.

 The vok is an important navigational aid to the pilot of an aircraft equipped with it. By tuning an instrument on the cockpit panel to the broadcasting frequency of an omnirange station on the ground, as depicted on standard aeronautical charts, the pilot can fly the aircraft to or from the ground facility with great accuracy. The necessary information is presented to the pilot visually by means of a vertical deviation needle and a “To-From” indicator. By the simple technique of keeping the vertical deviation needle centered, the pilot can fly directly to the ground facility and when he has arrived over the facility, the needle will swing back and forth thus informing him of his exact position. See Chapter 8 of the Pilot’s Radio Handbook, issued by the Federal Aviation Agency.

 The record contains some conflicting testimony and conclusions regarding the Lewis heading at the time of the collision. Analysis of these conflicts will be made below.

 A pattern used In event of a jet power loss commonly referred to as a “flameout.” The pattern Is practiced by nearly all units using subsonic and transonic fighters.

 This is a location five miles east of Runway 26. Jet fighters pass over the location, establish a flightpath from it along the runway extended centerline to the end of the landing runway. The landing from this position is a 360-degree overhead pattern.

 Initial approach is that portion along the runway extended centerline.

 In its requested findings of fact, tlie defendant has quoted certain of the cab’s conclusions from tlie aircraft accident report but states that it bas done so only for the purpose of showing how the cab arrived at its conclusions and to lay a foundation for demonstrating that its conclusions are not supported by substantial evidence. Defendant has carefully asserted that its use of the cab conclusions for those purposes should not be considered a waiver or an abandonment of its position that the conclusions of the Board should not be admitted at all. See finding 3, supra.

 It must be assumed, of course, that his main attention was directed towards safe driving of his truck.

 He had no flying experience of any kind; In fact, lie had never “ridden In an airplane.”

 The law was not made retroactive and, therefore, would not apply to this accident. See Maryland for the Use of Levin v. United States, 381 U.S. 41 (1965), vacated on other grounds, 382 U.S. 159 (1965).